## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| BILLY DEWAYNE COFFMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  4:16 CV 566 JMB |
| | ) | |
| | ) | |
| NANCY A. BERRYHILL,[1] | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM AND ORDER</u>

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner denying the applications of Billy Dewayne Coffman ("Plaintiff") for disability insurance benefits under 42 U.S.C. §§ 401 <u>et</u> <u>seq.</u>  Plaintiff has filed a brief in support of the Complaint.  (ECF No. 19)  Defendant Commissioner Nancy A. Berryhill has filed a brief in support of the Answer (ECF. No. 24)  The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to Title 28 U.S.C. § 636(c) (Doc. No. 7).

Substantial evidence supports the Commissioner's decision, and therefore it is affirmed. <u>See</u> 42 U.S.C. § 405(g).

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit.  No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

# I. Procedural History

On January 26, 2015, Plaintiff filed an application for disability benefits, claiming that his disability began on April 30, 2013. (Tr. 13) Plaintiff's claims were denied upon initial consideration in a decision issued March 5, 2015.[2] (Tr. 201-12) Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ").

Plaintiff appeared at the hearing with counsel on September 23, 2015, and testified concerning the nature of his disability, his daily activities, functional limitations, and past work. (Tr. 170-93) The ALJ also heard testimony on that date from Barbara Meyers, a vocational expert ("VE") who offered opinion testimony as to Plaintiff's ability to secure other work in the national economy, based upon several hypothetical questions. (Tr. 194-200) The ALJ issued a decision on November 25, 2015 ("the Decision"), finding that Plaintiff was not disabled. (Tr. 13-24)

Plaintiff then sought review of the ALJ's decision before the Appeals Council of the Social Security Administration. (Tr. 8) The Appeals Council received additional medical records from the St. Louis Veterans Administration ("VA") Medical Center.[3] (Tr. 6) On March 8, 2016, the Appeals Council denied review of Plaintiff's claims, (Tr. 1-5), making the November 2015 decision of the ALJ the final decision of the Commissioner. Plaintiff has therefore exhausted his administrative remedies, and his appeal is properly before this Court.

---

[2] There is a minor inconsistency in the date of initial denial in the ALJ's Decision, where it is listed as March 10, 2015. (Tr. 13) The inconsistency is of no legal import.

[3] Additional medical records for the time period after the Decision was issued, including a hemi-laminectomy and discectomy performed on February 22, 2016 at the Jefferson Barracks VA Medical Center, are included in the record in the instant matter. (Tr. 26-169) The Appeals Council received but did not consider these additional records because those records concerned matters that occurred after the ALJ's decision. (Tr. 2) This is consistent with 20 CFR § 404.970 (a)(5), which in relevant part provides for Appeals Council review if the new material "relates to the period on or before the date of the hearing decision[.]"

See 42 U.S.C. § 405(g).

In his brief to this Court, Plaintiff raises the following four arguments: (1) that the ALJ "failed to properly evaluate Plaintiff's pain complaints" and therefore formulated an RFC not supported by substantial evidence; (2) that the ALJ did not adequately account for Plaintiff's claimed insomnia in formulating the RFC; (3) that the ALJ improperly discounted the opinion of Plaintiff's treating psychologist; and (4) that the RFC is "simply conclusory and does not contain any rationale or reference to the supporting evidence." (ECF No. 19)

## II.      Plaintiff's Disability and Function Reports and Hearing Testimony

In his disability paperwork, Plaintiff indicated that he was suffering from radiculopathy in both legs, residual chronic lower back pain from a lumbar strain, patellofemoral syndrome in both knees, tension headaches, post-traumatic stress disorder and depression. (Tr. 333) Plaintiff completed high school and one year of college. (Tr. 334) He listed a job history over the last 15 years of military service in logistics, truck driving, corrections officer, mining laborer, port-o-potty delivery, assembly for a retail store, box assembly and shipping and receiving.[4] (Tr. 342-51)

Plaintiff indicated that he lived in a house with his wife. (Tr. 352) He described some problems with personal care, mostly involving bending over or reaching his feet. (Tr. 353) Plaintiff indicated that he performed some household work (doing the dishes, doing laundry, sweeping and mopping), as well as cooking and helping take care of the cat. (Tr. 353-54). He stated that he had to take a break while washing dishes, due to an inability to stand for the entire time. (Tr. 322)

---

[4] The medical records also indicate Plaintiff was employed (or self-employed) at a saw mill or lumber yard in 2013. (Tr. 705, 910, 1081, 1159) This employment was not included in his application materials or mentioned during his hearing.

Plaintiff stated he was able to go out once day, drive without need of accompaniment, and shop for a wide variety of items.  (Tr. 355)  He stated that he was able to handle basic financial affairs, such as paying bills, using a checkbook and handling a savings account.  (Id.)  Plaintiff listed his hobbies as watching television as well as hiking, fishing, hunting and carpentry, although he is unable to do any of these except watch television due to his conditions.[5]  (Tr. 325, 356)  Plaintiff stated that he formerly engaged in social activities with friends 3-4 times per week, although this has tailed off to telephone conversations, going to church every other weekend and visiting his mother once a month.  (Tr. 326, 356)

Plaintiff reported that he could pay attention for up to 10 minutes at a time, had issues finishing what he started, had no problem following written instructions but had difficulties with spoken instructions.[6]  (Tr. 326)  He also stated that he got along fine with authority figures and handled changes in routine well, but did not handle stress well and had a "fear of crowds."  (Tr. 327)  Plaintiff stated that his conditions affected his ability to concentrate and complete tasks, due to the pain.[7]  (Tr. 326, 357)

Plaintiff was also interviewed on February 10, 2015.  (Tr. 329-331)  The interviewer noted that Plaintiff walked with the assistance of a cane, and that he "had some trouble focusing due to his medications."  (Tr. 330)

---

[5] On August 18, 2013, nearly four months after his claimed onset of total disability, Plaintiff was seen at an emergency room due to a hand injury incurred while fishing.  (Tr. 732-35)

[6] There is a slight discrepancy as to his mental function between the first Function Report (filled out on February 10, 2015) and a later handwritten Function Report dated March 10, 2015.  In the former, he represented he could maintain attention for 10 minutes, while in the latter he stated he was able to attend for 15 to 30 minutes.  (Tr. 357)

[7] Again, there is a discrepancy between the two Function Reports.  Both claim that his concentration and ability to complete tasks are impaired, while the earlier report also lists problems with memory, understanding and following directions.  (Tr. 326)

During the September 2015 hearing before the ALJ, Plaintiff testified that his back and leg problems were the biggest obstacle to his ability to work.  (Tr. 179-80)  He stated that he was unable to continue in his last employment as a truck driver because the pain was too severe, and he was unable to drive if he took his pain medication.  (Tr. 179)  He described the pain as "like a searing needle going into a blister" which is always present in his lumbar spine, with three to four episodes per day of shooting pains "like electricity going down the back of [his] leg and into [his] toes."  (Tr. 180-81)

Plaintiff stated that he had been prescribed the cane by the VA Medical Center and he uses it for stability while walking, although he can stand in place without the cane.  (Tr. 182)  Plaintiff claimed he cannot stoop or crouch, but can kneel to retrieve things from the floor (albeit with discomfort).  (Tr. 183)  He estimated that he could usually lift and carry up to eight pounds.  (Id.)  Plaintiff also testified that he could stand for 10-15 minutes at a time, walk no more than 100 yards, and sit for between half an hour to an hour before needing to move.  (Tr. 183-84)  He estimated the pain level in his back at three to five (out of ten) on a good day, and between six and eight on a bad day.  (Tr. 188)

In terms of treatment for the back and leg pain,  Plaintiff stated that he takes medication, and uses a transcutaneous electrical nerve stimulation ("TENS") unit daily and a prescribed traction table twice a day.  (Tr. 186)  He also claimed to have had approximately five steroid injections, with pain relief lasting less than two days for most.  (Id.)  At the time of the hearing, Plaintiff had tried physical therapy, and had been prescribed more physical therapy by a neurosurgeon he had consulted.  (Tr. 187)  Plaintiff claimed that his medications make him sleepy, and that he naps for three to four hours during the day.  (Tr. 190-91)

Plaintiff also testified at the hearing regarding his psychological health.  He described

having "bouts of sadness" and "crying spells" every day. (Tr. 191-92) He also described feeling "trapped" and feeling the need to escape if in a crowded space. (Tr. 192) Plaintiff also testified that he has "problems with concentration," such as entering a room and forgetting what he went in there to get. (Id.)

### III. Medical Records

The administrative record before this Court includes voluminous medical records from two VA facilities, reports from non-VA providers incorporated into the VA's system, and a non-VA rehabilitation center. The Court has reviewed the entire record. The following is a summary of pertinent portions of the medical records relevant to the matters at issue in this case.

#### A. Physical Disorders

The earliest records included in the transcript are from April 2012, which notes that Plaintiff suffers from chronic back pain. (Tr. 820-821) On December 12, 2012, Plaintiff was seen at the John Cochran VA Medical Center, primarily for pain and inflammation under his jaw. (Tr. 766-67) During this visit, Plaintiff complained that he had noticed pain in his right upper back, as well as muscle cramping in his lower legs, developing over the previous month. (Tr. 766) He stated that he would sit from 12-20 hours. (Id.) Otherwise, he described himself as "doing great." (Id.)

On May 31, 2013, Plaintiff went to the urgent care department at the John Cochran VA when his left foot was injured by a log falling on it. (Tr. 747) He informed the staff that he examined the foot at the time of the accident, and then "worked for two more hours." (Tr. 750) Three x-rays of the foot revealed no acute injuries, and the report did not note any abnormalities. (Tr. 854-55)

Plaintiff was again seen at the John Cochran VA on July 16, 2013 in relation to chronic

lower back pain and migraine headaches.  (Tr. 739-45)  Plaintiff underwent x-ray examination of his lower back and spine, which showed "[v]ery early changes of degenerative arthritis" but no narrowing of the intervertebral disk spaces and no acute bone or joint changes noted when compared to a 2011 set of x-rays.  (Tr. 401)  In response, his medications were changed to include Fiorcet (an acetaminophen/caffeine/barbiturate medication often used for headaches), tizanidine (a muscle relaxant) and tramadol (an opioid pain medication).  (Tr. 740-741)  Despite this change in medication, Plaintiff called the VA to get a referral to a chiropractor for "unbearable" back pain.  (Tr. 736)

On August 18, 2013, nearly four months after his claimed onset of total disability, Plaintiff was seen at an emergency room due to a hand injury incurred while fishing.  (Tr. 731-35)

On August 20, 2013, he presented back to John Cochran for complaints of left foot soreness and occasional swelling, as well as increased back pain. (Tr. 722-30)   No changes to his medication or treatment were made.  (Tr. 730)  He stated that the tizanidine worked much better than his previous muscle relaxant, that the Fiorcet had worked well, and that as a result of the Fiorcet he had only taken one or two tramadol  in the month since it was prescribed.  (Tr. 722)  He stated that he only used the TENS unit "once in a while."  (Id.)  On his Patient Health Questionnaire 9 (PHQ-9), Plaintiff's score fell into the "no depression" range.  (Tr. 726)

On September 9, 2013, Plaintiff underwent an MRI of his spine.  (Tr. 399-400)  The test was essentially normal, except for a "mild central posterior bulge of the L5-S1 disc without obvious herniation or neural impingement."  (Tr. 399)

Plaintiff underwent a cardiac workup on September 17, 2013, due to an elevated heart rate during his PT evaluation.  (Tr. 700)  The tests showed a normal heart size, no infiltrates and

no effusions.  (Tr. 398)  Plaintiff was prescribed a low dose of metoprolol.  (Tr. 701)

Plaintiff was seen on a follow-up visit for his pain on October 5, 2013.  (Tr. 684)  He stated that the tramadol was effective when taken as needed.  (Tr. 691)  Plaintiff had been going to a chiropractor and needed an order for additional visits.  (Tr. 684)  These visits were denied, and Plaintiff was later informed that "neurosurgery feels that he has nothing on the MRI that is not age related changes and no further treatment is warr[a]nted at this time[.]"  (Tr. 687)

On February 27, 2014, Plaintiff had both knees x-rayed, and was evaluated by Dr. Edward Kreulen, M.D., to determine Plaintiff's eligibility for an increase in his service-related disability rating.  (Tr. 396-397; 1071-95)  On the x-rays, no osseous or adjacent soft tissue abnormalities were found in either knee.  (Tr. 396-397)  Plaintiff was able to bend his knees to the full 140 degrees, with pain starting at 130 degrees.  (Tr. 1085)  Plaintiff reported that after repetitive use, both knees have pain, swelling, disturbance of locomotion and interference with sitting, standing and weight-bearing.  (Tr. 1087)  He also stated that if he "had to squat more than an hour in the course of the day" there would be "significant limitation in his range of motion." (Id.)  Objective examination revealed no muscular weakness or instability, and no indication of recurrent patellar subluxation or dislocation.  (Tr. 1087-1090)  While Dr. Kreulen opined that it was "feasible" that during flare-ups or after repeated use over time Plaintiff's knees could have significantly limited functional ability, he was unable to form an opinion as to what extent such limitations might exist.  (Tr. 1091)  As to his back, Plaintiff was observed as having a range of motion of 85 degrees forward flexion (with objective evidence of pain beginning at 80 degrees), the full 30 or more degrees of extension (with pain beginning at 25 degrees), 25 degrees of right lateral flexion, 30 degrees of left lateral flexion and a full range of motion for lumbar rotation. (Tr. 1074-75)  He was noted as having an antalgic gait and palpable muscle spasms.  (Tr. 1076)

He had full muscle strength and normal deep-tendon reflexes, with normal sensation to light touch until his feet, where sensation is decreased. (Tr. 1077-78) His straight-leg raise test was negative for both legs. (Tr. 1078) Plaintiff was noted as having "mild" paresthesia or dysesthesia and numbness in both legs, and mild radiculopathy. (Tr. 1078-79) Plaintiff also reported to Dr. Kreulen that his tension headaches were "becoming more frequent and had been increasing in intensity over the past 2-3 years." (Tr. 1093)

On April 12, 2014, Plaintiff had a follow-up exam. (Tr. 606) He reported that the Fiorcet was no longer working to address his headaches, and that he had stopped taking the tramadol due to his other medications. (Tr. 612) He also reported that his service-related disability percentage had been raised from 50% to 80%, and that he "is wanting to try for 100% for his chronic arthralgias." (Tr. 606) Plaintiff was prescribed naproxen for his pain and atorvastatin for his cholesterol. (Tr. 608-09)

On September 4, 2014, Plaintiff was seen for a general follow-up. (Tr. 580) He stated that in the last two months he had increased lumbar pain, that the pain was a constant 8/10 in intensity, and was radiating down both legs. (Tr. 581) The staff physician who examined Plaintiff noted that he appeared uncomfortable sitting, displayed difficulty "taking even a few steps and getting up from a chair so as not to strain his back as much." (Tr. 582-83). He also noted bouts of nausea, difficult urination and urine retention. (Tr. 581) Plaintiff stated that he was not sleeping well due to the pain. (Tr. 585) Plaintiff was given an injection of methylprednisolone, started on gabapentin and switched from naproxen to meloxicam. (Tr. 580-81) On the advice of the staff physician, he also requested and was issued a cane. (Tr. 583, 578-79)

On September 29, 2014, Plaintiff saw Dr. Neela Ramaswamy, M.D., for a pain consult.

(Tr. 569)  He rated his pain that day as 6 out of 10, and reported that he could neither lie on his back nor bend over.[8]  (Tr. 570)  Range of motion in all directions was limited due to pain.  (Tr. 571)  As a result, Dr. Ramaswamy decided to perform a series of epidural steroid injections ("ESIs"). (Tr. 572)  The procedures were performed on October 1 and October 15, 2014.  (Tr. 562-63, 566-67)

On October 28, 2014, Plaintiff had a routine follow-up visit, where he reported a pain level of 3 out of 10.  (Tr. 558)  He also reported his usual pain level as a 4, and when asked what an acceptable level of pain to live with would be, he answered "0".  (Tr. 559)

On February 3, 2015, Plaintiff was seen by Dr. Ramaswamy for continuing pain in his lower back.  (Tr. 982)  She noted that previous ESIs had only provided relief for 2-3 weeks.  (Id.) Nevertheless, on February 11, 2015, Plaintiff underwent another spinal injection.  (Tr. 979-82)

On April 1, 2015, Plaintiff again saw Dr. Ramaswamy, complaining that the effects of the ESI lasted only two days and that he could hardly function.  (Tr. 1374)  She referred him for a neurosurgical consult, a back brace and more ESIs.  (Id.)  The ESIs were performed on April 15 and May 6, 2015.  (Tr. 1368-69, 1361)  In the latter case, Dr. Ramaswamy placed the injection in the L4 level, because she thought that might be the source of the pain.  (Tr. 1361)

On April 8, 2015, Plaintiff saw Dr. Louis Caragine, M.D. Ph.D., for a neurosurgical consult.  (Tr. 1370)  Plaintiff reported that the pain in his left buttock and down the back of his thigh was actually worse than the lumbar pain.  (Id.)  Dr. Caragine noted that Plaintiff had full motor strength in all muscle groups, and was able to lift up his heels and go back on his toes. (Id.)  He also noted that Plaintiff had poor flexibility (which he ascribed to the long period since Plaintiff last had physical therapy) and was not able to do a straight-leg raise with his right leg,

_____

[8] The undersigned notes that less than two weeks earlier, Plaintiff reported that to his therapist that he was in no pain, and that his non-narcotic medications were working.  (Tr. 574-75)

although he had an 80 degree raise on the left.  (Id.)  Pending results from an upcoming MRI, Dr. Caragine recommended conservative management including more therapy.  (Tr. 1370-71)

On May 13, 2015, Plaintiff again saw Dr. Caragine.  (Tr. 1321)  Dr. Caragine expressed some doubts as to Plaintiff's home compliance, stating that he "can tell that [Plaintiff] does not do any significant stretching or any conservative management on his own."  (Tr. 1322)  He noted that Plaintiff had significant stiffness and reduced range of motion, and that the disc bulge noted on his previous MRI could be irritating a nerve root.  (Id.)  Pending the results of a follow-up MRI, Dr. Caragine recommended a course of additional physical therapy.  (Tr. 1322-23)

On May 15, 2015, Plaintiff underwent another MRI on his lumbar spine.  (Tr. 1293)  It revealed a retrolisthesis (displacement of one vertebra relative to its neighbor) between the L5 and S1 vertebrae, evaluated as the mildest "grade 1" variety.  (Id.)  The MRI showed multilevel disc desiccation with a mild loss of disc height at L5-S1, mild bilateral facet hypertrophy and minimal endplate degenerative changes.  (Tr. 1294)  The interpreting neuroradiologist compared this scan with the September 2013 study, and concluded that it showed "unchanged degenerative changes of lumbar spine with a central disc protrusion at L5-S1 without significant central canal or neural foraminal stenosis."  (Id.)

Plaintiff had an initial evaluation at ProRehab's facility in Farmington, Missouri on May 22, 2015.  (Tr. 1839)  The physical therapist noted that he had a "very limited" range of motion, but that Plaintiff's strength in his key muscle groups was "intact."  (Tr. 1840)  His rehabilitation potential was rated as "fair."  (Id.)

On May 29, 2015, Plaintiff underwent a physical therapy consult with Dr. James Toombs, M.D.  (Tr. 1351)  Plaintiff reported that the ESIs had given him very little relief, and that his current physical therapy program was not affording him any significant relief.  (Id.)

Plaintiff was noted as having very tight hamstrings. (Tr. 1353) Dr. Toombs stated that Plaintiff had no increase of pain with flexion, extension, sidebending or rotation of the lumbar spine, but that he did have a reduced range of motion. (Id.) His judgment was that Plaintiff's "best relief will come via PT and a self-paced exercise program." (Tr. 1354)

On June 5, 2015, his physical therapist issued an update on Plaintiff's progress and condition. (Tr. 1843) Plaintiff was rated as having lost strength in the key muscle groups at L4, L5 and S1, and the therapist noted that Plaintiff's "perceived disability has increased since the [May 22, 2015] Initial Evaluation, even though he has increased fluidity of transitional movements while in the clinic this date." (Tr. 1843-44)

On July 2, 2015, Plaintiff underwent another physical therapy consult. (Tr. 1309) He stated that the ESIs had been of "limited to no benefit" and reported back pain ranging from four to seven. (Tr. 1310) The examiner noted severe hamstring adaptive shortening, with moderate shortening of his hip flexor and piriformis. (Id.) Both legs retained normal strength. (Id.) Plaintiff was evaluated as having a lumbar spine range of motion of 50% on flexion and 0% with pain on extension. (Id.) He displayed a 50% range of motion on both right rotation and side bend, while he had 50% range of motion on his left rotation and 25% with pain on his left side bend. (Id.)

In a progress note dated July 13, 2015, Plaintiff reported that he had tolerated all physical therapy activities well. (Tr. 1339-1340) He did note that the traction trial at his previous visit benefited him, and he reported a decrease in back and leg pain after undergoing another trial on this date. (Tr. 1340) Plaintiff was given a home lumbar traction device at his next visit. (Tr. 1338)

On November 25, 2015, Plaintiff was examined by Dr. Steven Spencer Smith, D.O., for

his service-related disability. (Tr. 1871-91) Dr. Smith stated that Plaintiff had degenerative arthritis of the lumbar spine, but displayed a full, normal range of motion in his back, full muscle strength, normal sensation and no radiculopathy. (Tr. 1872-76) Dr. Smith opined that Plaintiff's unchanged lumbar pain did not impact his ability to work. (Tr. 1877) As to Plaintiff's knees and peripheral nerves, he gave Plaintiff a clean bill of health. (Tr. 1877-91)

On January 11, 2016, after the ALJ had issued her Decision, Plaintiff had another MRI on his lumbar spine. (Tr. 32-33) That MRI found that Plaintiff had a "slight progression" of the degenerative change at L5-S1. (Tr. 33) On February 22, 2016, shortly before the Appeals Council issued its confirmation letter in this matter, Plaintiff underwent a successful hemi-laminectomy and discectomy in the left L5-S1 area. (Tr. 51-131) No primary care, pain management or neurosurgical records between the Summer of 2015 and the day of surgery are included in the transcript, so it is not apparent what prompted the decision to operate. Two days later, Plaintiff reported that he was "sore" but was "feel[ing] a little better every day." (Tr. 94) As discussed in Note 2 above, the Appeals Council determined that these records did not relate to the period prior to the ALJ's Decision, and so were not grounds for review. Although it is certainly arguable that Plaintiff's further slight degenerative change did not appear overnight, the Court cannot say that the Appeals Court erred in excluding these records. See Roberson v. Astrue, 481 F.3d 1020, 1026 (8th Cir. 2007) No subsequent records are provided from which a finder of fact could evaluate the long-term success of the procedure.

### B. Psychological Issues

Plaintiff had a history of depression, and was noted as being depressed during his July 16, 2013 office visit. (Tr. 745)

Plaintiff underwent a Mental Health Initial Assessment on August 22, 2013. (Tr. 714)

The examiner found that he had a depressed mood, that his affect was appropriate, and that he was cooperative. (Tr. 717-18) Plaintiff was alert and fully oriented, with normal concentration, normal insight/judgment, normal memory and normal intelligence. (Tr. 718) The examiner made an initial diagnosis of depression and possibly PTSD, and listed "sleep" as one of the issues to be addressed. (Id.)

On September 5, 2013, Plaintiff saw Dr. Vegas Coleman, M.D., for his depression and insomnia. (Tr. 708-12) Dr. Coleman noted that Plaintiff had been effectively treated for both issues using a combination of Zoloft, hydroxyzine and Xanax. (Tr. 708) Dr. Coleman prescribed mirtazapine to aid with both depression and sleep issues. (Tr. 711)

On September 11, 2013, Plaintiff saw Robert Norman, LCSW, for psychological therapy. (Tr. 705-07) Plaintiff had previously seen Mr. Norman, but stopped approximately two years earlier due to not wanting to face his issues in therapy. (Tr. 705) Plaintiff stated that he was unhappy as a truck driver "due to being away from home so much," and thus had quit the job to work at a small saw mill. (Id.) Mr. Norman recommended cognitive behavioral therapy for Plaintiff, to be conducted by another therapist in the more accessible location in Farmington. (Id.)

Plaintiff began therapy with Marilyn Shoumake, MSW LCSW, on October 2, 2013. (Tr. 694) She noted that he was in a good mood with appropriate affect. (Tr. 695) Plaintiff was fully oriented, although he had some concentration issues and limited insight and judgment. (Tr. 696)

On October 10, 2013, Plaintiff followed up with Dr. Coleman for his psychiatric medications. (Tr. 681) Plaintiff was not sleeping well, having problems both falling asleep and staying asleep. (Id.) His mood was improved, both by self-report and Dr. Coleman's observation, and he exhibited good insight and judgment. (Id.) Dr. Coleman increased his

mirtazapine and instructed him to call if his sleep was still not improved.  (Tr. 682)

Plaintiff had another session with Ms. Shoumake on November 4, 2013.  (Tr. 671)  He reported no pain, and presented in a good mood.  (Tr. 677)  He discussed a number of aspects of his depression and anxiety, including his impulse to "flee" when in a group situation.  (Tr. 678)  Ms. Shoumake still rated Plaintiff as having concentration issues and limited insight/judgment.  (Tr. 677)

On December 12, 2013, Plaintiff saw Dr. Coleman.  (Tr. 663)  Because Plaintiff was still having sleep issues and was concerned about weight gain, the decision was made to stop mirtazapine and start citalopram, while using the trazadone as a sleep aid.  (Id.)  Plaintiff called Dr. Coleman on January 30, 2014 to report that he was able to fall asleep but had trouble staying asleep even taking the trazadone, whereupon his dosage was increased for a trial period.  (Tr. 646)

Plaintiff followed up with Dr. Coleman on February 13, 2014.  (Tr. 643)  Plaintiff stated that his mood was improving and his concentration was better.  (Id.)  He still had issues staying asleep and felt groggy in the morning with the higher dosage of trazadone.  (Id.)  As a result, Plaintiff was prescribed Ambien for sleep.  (Tr. 644)

On March 27, 2014, Plaintiff again saw Dr. Coleman.  (Tr. 615)  Plaintiff stated that he had been "doing very good lately," described his mood as good, and stated that the Ambien had been a significant improvement for his sleep.  (Id.)  He still noted trouble falling asleep on occasion despite feeling groggy, which Dr. Coleman addressed by advising him about sleep hygiene and cutting down on his caffeine intake.  (Id.)

Plaintiff saw Ms. Shoumake on July 11, 2014.  (Tr. 591)  During this session, he noted that a book on self-esteem which Ms. Shoumake had assigned him was actually helping him

improve.  (Tr. 592)  He also reported improvement in managing negative thoughts.  (Tr. 593)

Plaintiff reported improved sleep with Ambien.  (Id.)

On September 19, 2014, Plaintiff again saw Ms. Shoumake.  (Tr. 573)  During this

appointment, roughly two weeks after being started on gabapentin and meloxicam and being

issued a cane as described above,  Plaintiff stated that his "current non-narcotic medications are

working and he is thankful for that."  (Tr. 575)  He also mentioned progress on the mental side,

describing a frustrating telephone call and his improved reaction to that frustration.  (Id.)

On November 2, 2014, Plaintiff had a follow-up appointment with Ms. Shoumake.  (Tr.

547)  He had married his significant other a week before.  (Tr. 549)  The overall tone of the

session appears to have been very positive.  Plaintiff believed that "he has developed skills to

manage his depression [,]" as well as skills "that have allowed him to make consistent and

sustainable changes in his life."  (Id.)  At that point, Plaintiff voiced a belief that he had

"achieved his goals" and chose to terminate his therapy.  (Id.)

On January 8, 2015, Dr. Coleman saw Plaintiff for a review of medications.  Plaintiff

stated that he had been doing "overall pretty good" and that citalopram (an anti-depressant) had

been helping with his mood.  (Tr. 543)  However, he reported that the Ambien was making him

"moody" at night, and Dr. Coleman decided to replace it with non-prescription melatonin.  (Id.)

On April 6, 2015, Plaintiff again saw Dr. Coleman.  (Tr. 1371)  Plaintiff was still having

sleep issues, so Dr. Coleman added temazapam to his medication regimen.  (Id.) He noted that

Ambien had previously been effective, but that he believed it caused him to "pick on" his wife

after he took it.  (Id.)  Plaintiff reported that the citalopram was helpful and that he no longer felt

"down on himself" as he had before therapy.  (Id.)

On June 19, 2015, Plaintiff transferred his psychiatric care to Dr. Carmen Espaillat-Serje

due to geographical reasons.  (Tr. 1345)  Plaintiff reiterated that the citalopram was helping him,

but that he was still having sleep troubles.  (Tr. 1347)  He reported tolerating the medication

regimen well.  (Id.)  Dr. Espaillat-Serje chose to increase his temazepam to try and deal with the

sleep issues.  (Tr. 1348)

Plaintiff saw Dr. Espaillat-Serje for a second time on August 20, 2015.  (Tr. 1330)

During this visit, Plaintiff reported that he was able to sleep better and had decreased anxiety and

depression.  (Id.)  No changes were made to his medication.  (Id.)  Dr. Espaillat-Serje also filled

out Plaintiff's Mental Residual Functional Capacity Questionnaire on this date, discussed in

greater depth below.

On November 20, 2015, Plaintiff again saw Dr. Espaillat-Serje.  (Tr. 1891)  Plaintiff was

observed to be in "good spirits" with a "brighter affect."  (Tr. 1892)  He stated that he was doing

well on his medications, and that his sleep and appetite were both "good."  (Id.)

## IV.    Opinion Evidence

Essentially, there are three professionals giving two and a half medical opinions in this

case: a non-examining state-agency psychologist (Scott Brandhorst, Psy.D), Plaintiff's treating

psychiatrist (Dr. Espaillat-Serje) and Plaintiff's pain-management doctor (Dr. Ramaswamy).

As part of the initial determination process on Plaintiff's disability claim, Dr. Brandhorst

was asked to review Plaintiff's mental health records available to that point, perform the

Psychiatric Review Technique, and offer a medical opinion on Plaintiff's Mental Residual

Functional Capacity.  Dr. Brandhorst noted Plaintiff's anxiety and depression diagnoses, and that

the latest mental health record to that point (January 2015 with Dr. Coleman, as detailed above)

showed that Plaintiff was tolerating his medication regimen well.  (Tr. 204-05)  Dr. Brandhorst

also considered Plaintiff's Activities of Daily Living as described in his application materials.

(Tr. 205)  Dr. Brandhorst found that the records and application materials showed that Plaintiff was "capable of performing simple tasks on a sustained basis away from public contact."  (Id.) In the Mental RFC statement, Brandhorst opined that Plaintiff was moderately limited in his ability to understand, remember and carry out detailed instructions, as well as his ability to work with or in close proximity to others without being distracted.  (Tr. 208)  He also rated Plaintiff as moderately limited in his ability to get along with coworkers and interact appropriately with the general public.  (Tr. 208-09)  The ALJ accepted this opinion as consistent with and supported by the evidence in the record.  (Tr. 22)

Dr. Espaillat-Serje issued her opinion on Plaintiff's mental functional capacity on August 20, 2015, after her second appointment with Plaintiff.  (Tr. 1832-36)  Dr. Espaillat-Serje asserted that Plaintiff was either "seriously limited, but not precluded" or "unable to meet competitive standards" in every single area of mental function.  (Tr. 1834-35)  Dr. Espaillat-Serje declined to provide any explanation as to how she reached these conclusions or where in the records such findings were supported.  (Id.)  Of particular interest are her findings that Plaintiff (a former truck driver who stated at the hearing that he had stopped due to physical discomfort) was unable to travel in an unfamiliar place, and that he was "seriously limited" in his ability to carry out very short and simple instructions, despite not having reduced intellectual functioning.  (Id.)  Dr. Espaillat-Serje opined that Plaintiff's psychological conditions would cause him to miss more than four work-days per month, but checked the "No" box when asked whether the impairment had lasted or was expected to last more than 12 months.  (Tr. 1836)  The ALJ chose to accord little weight to Dr. Espaillat-Serje's opinion, as it was contradicted by the existing records (including her own) which portray Plaintiff's symptoms as treated and stable.  (Tr. 22)  The ALJ also noted that Dr. Espaillat-Serje's representation that Plaintiff's conditions had not persisted

(and would not likely persist) for 12 months or more undercut Plaintiff's eligibility for disability benefits.

On the physical side, Dr. Ramaswamy partially filled out a Physical Residual Functional Capacity Questionnaire on September 17, 2015, a year into her treatment relationship with Plaintiff. (Tr. 1864-68) She filled out the first page of the document regarding Plaintiff's diagnosis (lumbar radiculopathy), symptoms, medication regimen and ESIs. (Tr. 1864) However, Dr. Ramaswamy did not complete the subsequent pages and offered no opinions on Plaintiff's actual functional capacity. (Tr. 1865-68) Apparently, Dr. Ramaswamy felt that she was not qualified to evaluate Plaintiff for disability purposes, and Plaintiff was directed to give the form to the Social Security Disability doctor provided. (Tr. 1899) Plaintiff does not appear to have done so. As the incomplete form gave no opinion or insight as to Plaintiff's functional capacity, the ALJ afforded it no weight.

## V.      Standard of Review and Legal Framework

To be eligible for disability benefits, Plaintiff must prove that he is disabled under the Act. See Baker v. Sec'y of Health and Human Servs., 955 F.2d 552, 555 (8th Cir. 1992); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). Under the Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c (a)(3)(A). A plaintiff will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §

423(d)(2)(A) and 1382c(a)(3)(B).  See also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

Per regulations promulgated by the Commissioner, 20 CFR § 404.1520, "[t]he ALJ follows 'the familiar five-step process' to determine whether an individual is disabled…. The ALJ consider[s] whether:  (1) the claimant was employed; (2) she was severely impaired; (3) her impairment was, or was comparable to, a listed impairment; (4) she could perform past relevant work; and if not, (5) whether she could perform any other kind of work."  Martise v. Astrue, 641 F.3d 909, 921 (8th Cir. 2011) (quoting Halverson v. Astrue, 600 F.3d 922, 929 (8th Cir. 2010)).  See also Bowen, 482 U.S. at 140-42 (explaining the five-step process).

The Eighth Circuit has repeatedly emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration."  Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)).  The ALJ's findings should be affirmed if they are supported by "substantial evidence" on the record as a whole.  See Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008).  Substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."  Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Wildman v. Astrue, 964 F.3d 959, 965 (8th Cir. 2010) (same).

Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision."  Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).  The district court must "also take into account whatever in the record fairly detracts from that decision."  Id. Specifically, in reviewing the Commissioner's decision, a district court is required to examine the entire administrative record and consider:

1.      The credibility findings made by the ALJ.
2.      The claimant's vocational factors.
3.      The medical evidence from treating and consulting physicians.
4.      The claimant's subjective complaints relating to exertional and non-exertional activities and impairments.
5.      Any corroboration by third parties of the claimant's impairments.
6.      The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Sec'y of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (citation omitted).

Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence of record. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011). A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance. Id.; see also McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

## VI.      The ALJ's Decision

The ALJ's Decision conforms to the five-step process outlined above. She found that Plaintiff met the insured status requirements through December of 2018, and that he had not engaged in substantial gainful activity since the alleged onset date of April 30, 2013. (Tr. 15) The ALJ further found that Plaintiff had severe impairments of degenerative disc disease, patellofemoral syndrome in both knees, migraine headaches, hypertension, major depressive disorder, and adjustment disorder with mixed anxiety and depressed mood. (Id.)

The ALJ found that none of Plaintiff's impairments or combination of impairments met the criteria for the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 or was

medically equivalent thereto.  (Tr. 15)  Specifically, she analyzed his eligibility for Listing 1.04 (Disorders of the spine), Listing 1.02 (Major dysfunction of a joint), as well as evaluating his headaches' equivalency to any listing.  (Tr. 15-16)  As to his mental impairments, she considered Listings 12.01 and 12.06 and analyzed Plaintiff for the "paragraph B" criteria.  (Tr. 16)  The ALJ found that Plaintiff displayed only mild restriction on activities of daily living, as he was able to take care of his personal needs, perform household cleaning activities, cook, shop, pay bills and yard work, despite having to take breaks or sit down during some activities and some drowsiness due to medications.  (Id.)  Plaintiff was determined to have mild limitations in social functioning, as he reported no problem getting along with others but anxiety when in large groups or crowds.  (Id.)  The ALJ also found that Plaintiff had moderate difficulties in maintaining concentration, pace or persistence, based on his own reports of difficulties concentrating, completing tasks, remembering to take medications without a reminder and reading comprehension.  (Tr. 16-17)  Without any marked limitations and no episodes of decompensation, the ALJ found that he did not qualify for a listing for his psychological or mental impairments.  (Tr. 17)

The ALJ determined that Plaintiff had a residual functional capacity ("RFC") to perform light work with the following modifications: he could occasionally stoop, crouch, crawl and climb stairs, but not climb ladders, ropes or scaffolds; he was limited to simple, routine and repetitive tasks that do not involve a fast pace of work (e.g. no assembly-line work); and he could have only occasional interaction with coworkers and the public.  (Tr. 17)

In making this finding, the ALJ summarized the relevant medical records discussed above, as well as Plaintiff's own statements regarding his abilities, conditions, and activities of daily living.  While the ALJ found that Plaintiff's medically determinable impairments could

reasonably be expected to cause the alleged symptoms, she also determined that his statements regarding their intensity, persistence and limiting effect were "not entirely supported" by the record as a whole.  (Tr. 19)

The ALJ found that Plaintiff's described activities of daily living appeared to be "restricted more by his choice and not by any apparent medical proscription."  (Id.)  She noted that there was no record of any physician putting any restrictions on his exertional activities, and that there was no indication that the non-exertional pain seriously interfered with his ability to concentrate or focus. (Id.)  The ALJ acknowledged that Plaintiff suffered from chronic pain, but noted that the records show no "significant degree of muscle atrophy, muscle spasm, sensory or motor loss, reflex abnormality or significantly reduced range of motion[.]" (Tr. 19-20)  She also noted that Plaintiff's diagnostic imaging testing showed only mild disc bulge without herniation or neural impingement in his back, and no abnormalities at all in his knees.  (Tr. 20-21)  The ALJ further noted the relatively conservative measures that Plaintiff had been prescribed to treat his chronic pain (both lumbar and headaches), including non-narcotic medication, muscle relaxants, chiropracty, and a cane which he did not always use. (Tr. 20)

As to Plaintiff's mental impairments, the ALJ reviewed in detail his treatment records from August of 2012 to June 2015.  (Tr. 21-22)  She noted that Plaintiff's mental impairments appeared to be well-controlled by his medications.  (Tr. 20)  She also noted the clear improvement in his mental impairments through the course of his pharmacologic and therapeutic treatment.  (Tr. 21-22)

The ALJ concluded that Plaintiff could not return to his past relevant work as a truck driver, corrections officer, mine laborer, shipping and receiving clerk or supply specialist.  (Tr.

23) Based on hypothetical questions posed to the VE, the ALJ found that Plaintiff was not under a disability within the meaning of the Social Security Act because someone with his age, education and functional limitations could perform other work that existed in substantial numbers in the national economy, namely as a merchandise marker (with approximately 340,000 jobs nationwide) or a collator operator (with approximately 28,000 jobs nationally). (Tr. 23-24) As such, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security statute and regulations. (Tr. 24)

## VII. <u>Analysis of Issues Presented</u>

In his initial brief to this Court, Plaintiff argued that: (1) that the ALJ "failed to properly evaluate Plaintiff's pain complaints" and therefore formulated an RFC not supported by substantial evidence; (2) that the ALJ did not adequately account for Plaintiff's insomnia in formulating the RFC; (3) that the ALJ improperly discounted the opinion of Plaintiff's treating psychologist; and (4) the RFC is "simply conclusory and does not contain any rationale or reference to the supporting evidence." (ECF No. 19) The Court addresses each of Plaintiff's proffered issues below.

### A. Improper Evaluation of Pain Complaints

Plaintiff first argues that the ALJ erred in discounting the intensity, persistence and limiting effects of Plaintiff's pain, and that as a result, the RFC is not supported by substantial evidence. While a rational finder of fact might draw a different conclusion from the record, there is more than substantial evidence to support the ALJ's conclusion on this issue.

The diagnostic imaging was (as described above) largely unremarkable. Thus, the question of Plaintiff's pain rests largely upon his subjective reports, which in turn implicates Plaintiff's credibility. "Before determining a claimant's RFC, the ALJ first must evaluate the

claimant's credibility." Pearsall, 274 F.3d at 1218. See also Wildman, 596 F.3d at 969 (8th Cir. 2010) ("[Plaintiff] fails to recognize that the ALJ's determination regarding her RFC was influenced by his determination that her allegations were not credible.") (citing Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005)); 20 CFR. §§ 404.1545, 416.945 (2010).

In assessing a claimant's credibility, the ALJ must consider: (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints. Finch, 547 F.3d at 935; Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). ALJs need not explicitly discuss each Polaski factor. Buckner, 646 F.3d at 558 (citing Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005). "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." Pearsall, 274 F.3d at 1218. "If an ALJ explicitly discredits the claimant's testimony and gives good reason[s] for doing so, [a court] will normally defer to the ALJ's credibility determination." Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003). See also Halverson v. Astrue, 600 F.3d 922, 932 (8th Cir. 2010); Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006). The Court finds that the ALJ gave good reasons, based on substantial evidence, in support of her credibility determination.

As discussed by the ALJ, Plaintiff is (by his own account) largely participatory in his activities of daily living. There is in fact some question raised by the record as to whether Plaintiff was more active than he later testified. Despite telling the ALJ that his disability prevented him from engaging in prior hobbies such as fishing, Plaintiff was seen at the VA Medical Center after a fishing accident nearly four months after he alleges he was totally

disabled. (Tr. 732-35) While not sufficient unto themselves to support a determination of non-disability, activities of daily living inconsistent with a claimant's assertion of disability reflect negatively upon his credibility. Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001).

Similarly, Plaintiff's vocational history raises some credibility concerns. Plaintiff's history of active employment and job seeking do him credit. On the other hand, Plaintiff testified that truck driving was his last job before becoming disabled, and that he was forced to quit that job due to pain. (Tr. 179) He had previously told one of his therapists that he was unhappy as a truck driver "due to being away from home so much," and thus had quit the job to work at a small saw mill. (Tr. 705) This poses a credibility problem for Plaintiff, both in his differing explanations for why he left the trucking job and the subsequent sawmill employment that is not disclosed in any of his submitted materials.

Plaintiff's medical treatment history also serves to cast some doubt on the credibility of his subjective complaints. As noted above, Plaintiff's objective medical testing is unremarkable compared to the amount and disabling effect of pain claimed by Plaintiff. His diagnostic imaging show a mild bulge in his L5-S1 disc with no apparent nerve impingement, and his knees were normal. Plaintiff's range of motion is described inconsistently across medical providers, but Dr. Kreulen's measurements of his actual lumbar range of motion show it as normal or near normal in most respects.[9] While this alone is not adequate to discount the severity Plaintiff's subjective pain, it does contribute support for the ALJ's credibility determination.

Further, Plaintiff's treatment regimens for his physical and psychological issues were

---

[9] The ALJ did not have Dr. Smith's subsequent C&P examination record to evaluate, but the undersigned believes it would not affect the ALJ's determination. The finding of that report—that Plaintiff had no limitations of any kind in his back or knees—is so far out of line with even the most positive reports elsewhere in the record that the Court believes the ALJ would have discounted it out of hand.

relatively conservative and generally effective.  During the relevant period, his pain was medically managed with muscle relaxers and (often non-opioid) pain relievers as well as referrals to physical therapy.  Indeed, even some of the relatively conservative measures may not have been fully necessary—although Plaintiff was told by a staff physician who saw him once to get evaluated for a cane and he received one, there is no indication from any provider that Plaintiff actually needed it to walk, and he himself noted that he did not need it while standing.  Similarly, Plaintiff's psychological issues were effectively managed using standard medications supplemented by therapy as needed, to the extent that he felt well enough to discontinue therapy and limit treatment to relatively infrequent check-ins with his psychiatrists.

Dr. Caragine's 2015 neurological consultations serve to exemplify much of Plaintiff's treatment—he ascribed much of Plaintiff's stiffness to his prolonged absence from physical therapy and his apparent failure to do any significant stretching at home, suggested that Plaintiff did not need surgery and recommended physical therapy.  Dr. Toombs evaluated Plaintiff and also came to a similar conclusion: that physical therapy and a self-paced exercise program were the most appropriate course of treatment for Plaintiff's pain issues.

In summation, Plaintiff's courses of treatment were conservative and generally effective during the relevant pre-Decision period, and as such serve to detract from the credibility of his subjective pain complaints.  See Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998) (conservative course of treatment is consistent with discounting of subjective claim of disabling pain).

All of these factors come together to provide substantial support in the record for the ALJ's made a determination of the credibility of Plaintiff's pain complaints—essentially, that Plaintiff's pain did impose limits on his range of motion, but that he was not as limited as he felt. The ALJ's formulation of Plaintiff's physical RFC reflects this determination in assigning him a

light exertional level with additional limitations on activities that would stress the lumbar spine such as stooping, crouching, crawling and climbing stairs. As discussed in more detail below, the RFC was properly formulated given the ALJ's findings on pain issues.

### B. Insomnia

Plaintiff argues that the ALJ failed to adequately address his insomnia as related to his RFC. The undersigned finds that the ALJ's RFC adequately addresses all of Plaintiff's impairments, including insomnia.

Plaintiff correctly notes that he reported trouble getting to sleep and staying asleep for a significant portion of the time period covered by the record. However, the record also reflects that two different medication regimens were effective in restoring relatively normal sleep patterns. After several failed attempts to address his sleep disturbances with medications he was already taking, Dr. Coleman prescribed Ambien for Plaintiff on February 13, 2014. (Tr. 644) Plaintiff remarked on his improved sleep at both of his next two psychiatric appointments, as well as his next therapy appointment. Plaintiff chose to discontinue taking Ambien because he felt it made him "pick on" his wife before bed. The sleep disturbances reappeared, but Dr. Espaillat-Serje prescribed temazapam and eventually found the correct dosage—he reported improvement in his sleep during his last two visits with her, and went so far as to say his sleep was "good" at the final appointment.

There is substantial evidence in the record to support the ALJ's tacit conclusion that Plaintiff's insomnia did not significantly impair his ability to perform work tasks because it had been effectively managed with medication. See Davidson v. Astrue, 578 F.3d 838, 846 (8th Cir. 2009) ("Impairments that are controllable or amenable to treatment do not support a finding of disability.")

### C. Weight Given to Opinion Evidence

Plaintiff argues that the ALJ failed to properly weigh the medical opinion evidence by affording little weight to Dr. Espaillat-Serje's Mental Residual Functional Capacity Questionnaire. The Court disagrees, and finds that the ALJ's choice fell within her discretion.

Although Dr. Espaillat-Serje issued her formal opinion after only her second meeting with Plaintiff, Defendant appears to concede that she qualifies as a "treating physician" as to Plaintiff's mental condition. "A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Reece v. Colvin, 834 F.3d 904, 908-09 (8th Cir. 2016) (internal quotations omitted). "Although a treating physician's opinion is usually entitled to great weight, it 'do[es] not automatically control, since the record must be evaluated as a whole.'" Id. (quoting Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000)). "A treating physician's own inconsistency may undermine his opinion and diminish or eliminate the weight given his opinions." Milam v. Colvin, 794 F.3d 978, 983 (8th Cir. 2015) (internal quotations omitted). "Whether the ALJ gives the opinion of a treating physician great or little weight, the ALJ must give good reasons for doing so." Prosch, 201 F.3d at 1013 (citing 20 CFR. § 404.1527(d)(2)).

Here, the record as a whole is largely inconsistent with the level of dysfunction alleged by Dr. Espaillat-Serje, including her own progress notes. As detailed above, Plaintiff completed (to his own satisfaction) a course of therapy with Ms. Shoumake. During the course of that therapy, he displayed a steadily-improving mood, affect and thought process, as well as improved self-esteem, insight and judgment. Plaintiff chose to terminate therapy due to having

"developed skills to manage his depression," gained skills "that have allowed him to make sustainable changes in his life," and having "achieved his goals." (Tr. 549) Similarly, the records of his psychiatric treatment show a good response to antidepressant medication with minimal side effects. His sleep issues were resolved as well, as discussed above.

Very simply, there is no indication in the records of Dr. Coleman, Dr. Espaillat-Serje, Ms. Shoumake or any other medical professional that Plaintiff labors under the sort of broad-spectrum deficit in every area of his mental function that Dr. Espaillat-Serje alleges in her opinion. She opined that Plaintiff, a former truck driver who stated at the hearing that he had stopped due to physical discomfort, was unable to travel in an unfamiliar place. She opined that Plaintiff was "seriously limited" in his ability to carry out very short and simple instructions, despite his own representation on his Function Reports that he had "no problem" understanding and following written instructions.

Plaintiff's mental health treatment has been conservative in nature, consisting predominately of routine follow-up appointments, and outpatient medication management. See Robinson v. Sullivan, 956 F.2d 936, 840 (8th Cir. 1992) (course of conservative treatment contradicted claims of disabling pain). None of the providers dealing with Plaintiff's physical issues noted any of the cognitive deficits suggested in Dr. Espaillat-Serje's opinion, and neither did her own contemporaneous records.

Accordingly, the ALJ was justified in giving less than controlling weight to the opinions set forth in Dr. Espaillat-Serje's statement. The ALJ explained why she chose to discount the opinion, and that explanation offered a sufficient basis to support that decision. Cf. Papesh v. Colvin, 786 F.3d 1126, 1132 (8th Cir. 2015) (finding error when the ALJ offered no basis to give an opinion non-substantial weight).

### D.    Formulation of the RFC

Plaintiff contends that the RFC assessment was "simply conclusory" and contained no "rationale or reference to the supporting evidence."  This is incorrect.

A disability claimant's RFC is the most he or she can do despite his or her limitations. Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). "[A]n RFC determination must be based on a claimant's ability 'to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" McCoy v. Astrue, 648 F.3d 605, 617 (8th Cir. 2011) (quoting Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007)).  An ALJ bears "the primary responsibility for determining a claimant's RFC" and may take into account a range of evidence, from personal observation to the claimant's statements regarding his or her daily activities, but "because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC."  Vossen v. Astrue, 612 F.3d 1011, 1016 (8th Cir. 2010).  Further, an RFC determination "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." Gordon v. Astrue, 801 F. Supp. 2d 846, 861 (E.D. Mo. 2011)(quotation omitted).  This is not to say that each statement of a component of the RFC must be followed by a specific recitation of which records support that finding, but there must be some "narrative bridge" allowing a reviewing authority to see the ALJ's thought process.

In the instant case, the ALJ chose not to break down each impairment's influence on the formulation of the RFC in bullet-point granularity.  However, the ALJ's discussion of those impairments, the medical sources' records thereof, Plaintiff's own accounts and the relative weight she gave each opinion provides a sufficient basis to see how she determined the RFC

from those sources.  The postural limitations imposed on top of the overall "light work" standard are very clearly meant to address the pain in his lumbar spine and legs and resultant somewhat restricted range of motion.  Plaintiff's account of having anxiety issues around groups and crowds corresponds with the ALJ's limitation on contact with others.  Plaintiff's complaints of having difficulty focusing and paying attention for long periods are fairly met by the complexity limitation.  Having reviewed the decision and the record, the undersigned is satisfied that the record provides substantial support for that RFC.  To the extent there is any question that the ALJ should have been more explicit in linking each impairment to its RFC component, the undersigned notes that "deficienc[ies] in opinion-writing" which have "no practical effect on the outcome" of a case are not grounds for remand.  Draper v. Barnhart, 425 F.3d 1127, 1130 (8th Cir. 2005).

## VIII.    Conclusion

For the foregoing reasons, the Court finds that the ALJ's determination is supported by substantial evidence on the record as a whole.  See Finch, 547 F.3d at 935.  Similarly, the Court cannot say that the ALJ's determinations in this regard fall outside the available "zone of choice," defined by the record in this case.  See Buckner, 646 F.3d at 556.  For the reasons set forth above, the Commissioner's decision denying benefits is affirmed.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**.

A separate Judgment shall accompany this Memorandum and Order.

/s/ *John M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 29th day of August, 2017.